Oral argument not to exceed 15 minutes per side. Mr. Cabot for the Plaintiff Appellant. Good afternoon, Your Honors. May it please the Court, Sean Cabot on behalf of the Appellants. And I would like to reserve three minutes for rebuttal at this time. All right. Thank you. As the Court is aware, this is the case involving the tragic death of A.D. Barnes, where he was crushed to death by a 1,600-pound press cake while employed at Sun Chemical Corporation. And basically, we have a situation where a forklift operator on the day of the incident was taking the 1,600-pound press cake from the warehouse level, or I'll probably commonly refer to it as the floor, to the upper mezzanine level where they would put it down and then each subsequent bag would be pushed back with what's called the pushback method, which ultimately caused Mr. Barnes's death. As the Court is aware, this was a diversity action. It was originally filed in the Muskegon County Circuit Court. Because of diversity of the parties, it was removed to the Federal District Court and ended up in front of the Honorable Judge Maloney in the Western District of Michigan. Just briefly, some of the facts. The record was clear that Mr. Barnes had a very good record with the company. He didn't have any things in his employment file indicating he didn't follow the rules, that he didn't follow the safety requirements, anything like that. And so we have this transfer of the pigment on the day of this incident, which the record is complete that this transportation method occurred all the time. And basically what would happen was the high-low driver would activate a pull cord, which would cause a gate to go up. There was supposed to be a flashing warning light that would also work, but the record is very clear from the deposition not only of the employees, but from the Sheriff's deputy, I believe it was Foster, who investigated on the day of the incident that this emergency light didn't work. And it really was this emergency light that would alert people to the fact that there was... Well, there was conflicting testimony, and one or more of the witnesses even said they didn't know whether the light was working or not. Well, I think what happened was, I don't know that there's necessarily conflicting testimony. I know that when the Sheriff's deputy was there, he said that when he was there, he stood around for quite a while, and it would only occasionally work. And then we have the deposition testimony, I believe it was, of Mr. Collins, who was actually, as the court is aware, had a near-miss happen to him, the exact same type of incident where Presscake actually fell and grazed him back in 99. He said he had never seen the warning light work, and that's in his deposition testimony. And then we had Ms. Catherine. It's not clear whether it was working at the time of the accident. That's what we had, incomplete or conflicting testimony. Well, and I think, Judge Clay, that to the extent there is conflicting testimony, that's even one more reason that at a minimum the case should have been submitted to the jury, because that warning light is a huge issue. And the fact that the district court basically discounts that... To the extent it was an issue, wouldn't that go to negligence instead of willful misconduct? Absolutely not, because the knowledge that that... When you have the gate go up, okay, so the gate's up, the only real thing that you have to alert anybody that they're doing overhead work is that warning light. And there was evidence that the warning light hadn't worked in the past, albeit arguably conflicting evidence, but if that warning light didn't work or it didn't work consistently in the past and there was evidence that it was reported to management, that is most certainly willful disregard. And that knowledge, they basically just set it aside. And to say that it's negligence, it is not negligence. It is willful disregard, and I think it comports with the case law. I don't see anything in the record whereby the problem with the light was reported to management and they disregarded it. Do you have something like that in the record that you would like to point to? Let me just take a look. Ms. Brown's deposition, testimony Catherine Brown, she said before this incident she witnessed the warning light not working more than once when the overhead mezzanine gate was open and reported this to her team leader, i.e. a supervisor, i.e. a management official. That's just one indication I can find very quickly. Who did she report it to? Did she identify that person? She did not. She said it was her team leader. And I don't know that the record ever revealed who that was, but she very clearly testified that she reported it. Did she say when did that occur? Did she observe that? Did she report it in terms of relationship of the time of her observation to the time of the accident here? I don't think she could give a time, and I think she was asked if it happened days, weeks, or months, and I don't think she could give it a specific time. But I think that's important. You know, that raises an important point because in the Travis case, which is kind of the Michigan Supreme Court kind of case that kind of all the cases center around and offshoot from,  in a very interesting statement it said, just because something has happened before or on occasion does not mean it's going to be certain to occur. But it also went on to say that just because something has never happened before is not proof that it is not certain to occur. And I think regardless of whether it happened a week before, a month before, or a year before, or a decade before, such as what my learned colleagues argue about the 99 Collins incident, the fact that they were aware that the warning lights didn't work, that they were reported to, is certain evidence that is proof that this is going to occur. And so we have the situation that you also have the 1999 incident, everybody knew it as the Collins incident, kind of had its own phraseology there in the plant, indicating in and of itself that it was common knowledge, people knew that the Collins back in 99 had basically the same area, same type of thing happened, press cake fell, he was grazed, they knew about it. They also knew that there were a number of instances where pallets and I think a drum filter had even fallen from the upper mezzanine. And in fact, one of the management officials, I think it was Mr. Hendricks actually testified about his own knowledge that a drum had fallen from the mezzanine. Ms. Brown and Mr. Pontius, both employees, testified that they had seen objects fall from the mezzanine and reported it to management. And it was Scott Hendricks, according to my notes, that saw a fiber drum fall from the mezzanine. So we have the Collins incident, you have these near misses that occur subsequent to that, that all indicate they knew there was an injury that was going to occur. It had occurred in the past, these things happened before, they didn't take care of it. It's interesting also that the employees testified that this walkway where Mr. Barnes was killed was frequently traveled by the employees. And that management knew it. How do we know management knew that? Well, one of the management officials says, well, I gave somebody a verbal warning. Now that's very interesting, because if this was so serious, and if the company took it seriously, they would have certainly done more than just give a verbal warning, which probably wasn't even documented in a personnel file. If this was so serious, they would have documented it in a personnel file and certainly given more than a mere verbal warning. So their approach to their discipline for walking in these supposed non-walkable areas was actually nothing. And it shows their willfulness to allow people to get injured. How many times in the past had pallets or press gate fallen, and when did those incidents occur? The drum filter, the fiber drum fell, I believe it was in 2000, 2001. That was the incident that Mr. Hendricks testified to. During the depositions of Mr. Brown and Mr. Pontius, talking about the pallets and things, they were asked for a definite time period. They could not give it. They also could not give a number of times. I remember in the deposition they were asked, was it more than five, more than 20? They just couldn't account. But I don't think that's dispositive. Well, it's not dispositive, but it's certainly relevant. The only times you've mentioned is press gate fell in 1999 and there was an incident in 2001. Are those the only times that you're aware of? No. Ms. Brown and Mr. Pontius testified that they had seen objects fall from there. They just couldn't give a timeline. Well, what kind of objects? A baseball cap from a worker? They said pieces of pallet, I recall specifically, wooden pallets falling from there, which obviously can cause injury. And I know there was other incidents in the record that they testified to, but they couldn't give a definite time frame or the numbers. But, again, I don't think it's dispositive. I see my time is up. Well, let me ask you this, though. I presume for any accident the company would have a requirement that an incident report or an accident report be created or be written up and preserved and these things have to be submitted to the Occupational Health and Safety Agency and all that sort of thing. What do those records show? Well, the only one that I'm aware of was the MIOSHA report, and that's the Michigan Occupational Safety Health Association, Michigan, that was regarding this incident. There was also the internal incident report written by Mr. Nuttall. But the MIOSHA. But you all did do discovery to find out what reports and such of that nature would exist, I presume. Right. And I don't believe, Your Honor, that anything, even if it was reported, I don't recall that it was produced or at least not produced in the record that I could see. Some of it was verbal, which there wouldn't, and there was indication in the record that a lot of these complaints were verbal, and presumably they were not documented in the writing. But the fact that they were reported to supervisory personnel, even the case law from the cases in Michigan support that that's sufficient. All right. Good morning, Your Honors. Good morning. Jeff Dornbus on behalf of Sun Chemical, and may it please the Court, there is no dispute here that this case involves a tragic workplace accident, but the district court properly held that it does not rise to the level of an intentional tort. Travis, which was already referred to as the seminal case in Michigan on this particular issue, talks about the workers' compensation system in Michigan and gives the legislative history to that. And the idea is that under Michigan law, an injured employee who is injured at the workplace receives compensation. And in order to preserve that system and ensure that employees can receive that compensation, it's only in the context of an intentional tort where you can get recovery beyond that. And, in fact, Travis uses the words extraordinary circumstances and an extremely rigorous threshold to meet that. This court in the House decision, House v. Johnson Controls, in 2007, walked through Michigan law on this issue and walked through the Michigan cases and noted several times, at that time four times, where the Michigan Supreme Court had summarily reversed cases. And just to give the court an example, Alexander, in that particular case, there was a piece of sheet metal. These pieces of metal go through these large turning objects to form the sheet metal. There had been four prior injuries, two for new employees, two of those were amputations. There had been four meiosis citations prior to the plaintiff's injury in that particular case. And even on those facts, the court determined that the injuries were not certain to occur. In a more recent case, just to give you another example, because two times since House, which was a 2007 case, again in Smith, the Michigan Supreme Court again summarily reversed. And that was a case where an employee was trained to use a saw with the safety device taped down. Prior to the injuries, again, there was a meiosis indication that that particular saw needed to have safety devices on there. And again, in that particular case, the court held that it wasn't sufficient to meet this extraordinarily high burden. Here, there's two critical facts. What happened here was that there were two chance unrelated happenings that together led to a tragic workplace incident. What was happening was that high-lows, pallets of pigment, were being lifted from the warehouse floor up to a mezzanine level. And the operator, the high-low operator on the mezzanine level, testified that when she came out, she saw that a bag was slightly tipped, slightly off balance, on one of the pallets. And she said that she decided, this was decision number one, to attempt to move that, and she said, and I quote, I might have tilted the bag. And she tilted it, and she said she also used the word ramping it, and then the bag rolled off. That was chance happening number one. Number two was that Mr. Barnes was walking underneath the mezzanine at the time, and it's undisputed in the record that he was out of a restricted area and that there was another way he could have been walking. So the combination of those two chance happenings is what led to this result. You said out of a restricted area. Do you mean he was in a restricted area? He was in a restricted area. Thank you for correcting that. There was a designated walkway where he could have been walking, and instead of being on that designated walkway, he chose to walk off that and walk in a restricted area. And again, if I could refer to the House case, there the court determined that because Mr. House made a voluntary decision to leave the area and to go to, in that case it was these pieces of dye, one was being lifted up by a high-low, he exercised the word they used as volition. And because he exercised volition, it could not be an injury that was certain to occur in that particular instance. And because he exercised volition, it would not be possible for the employer, in that case Johnson Controls, to have actual knowledge ahead of time that that injury was certain to occur. So in order to meet their burden, they have to show that the injury was certain to occur, that Sun Chemical had actual knowledge, and that Sun Chemical willfully disregarded that actual knowledge. And again, under the House case, you can't have either one. You can't have certainty of injury and you can't have actual knowledge because not only one but two individuals exercised volition coming together to cause this tragic accident. If you look at the Travis case, they also talk about certainty of injury there. And in the Travis case, what happened was that a woman had been taught to use a press, to operate a press, and the machine had been cycling improperly in the past. She put her hand in it and it cycled when she put her hand underneath it, causing her injuries. And the court decided on those facts the injury could not be certain because it was only an intermittent risk. They compared that to a case in that case called Film Recovery. That's an example of a particular case where you could meet the intentional torque exception. In Film Recovery, workers were exposed to fumes, dangerous fumes, and they intentionally hired workers who could not read or speak English so they couldn't get the warnings. That's an example of a case that would constitute continuous certainty of injury. As far as actual knowledge, again, we've pointed in the briefing to a number of cases, and I'll rely primarily today on the House case, which I just described, that the employer cannot know in advance what decision an employee might make, and therefore doesn't have actual knowledge. Another example of that is a more recent case, a 2015 case, out of the Michigan Court of Appeals, where an individual was electrocuted and the court said that there was a series of decisions that led up to that point. And because there was a series of decisions that led up to that point, you couldn't have a situation where the employer is imputed with actual knowledge. And as far as the third aspect, the willful disregard, I'll point the court to the Travis and Gulick case, and specifically Marion, where in that case there was an explosion, and the court said that because, if you remember the Travis case, there's Travis, and it also discussed a companion case of Gulick. In Gulick, there was an explosion, the employee was ordered back to work, and because the employee was ordered back to work, the court determined that the employer had willfully disregarded the potential risks. And that was unlike Travis, where that was not the case. Here, there's no reason to believe that there's willful disregard. We talked a little bit about the 1999 incident, and subsequent to that incident, there were changes that were put into place to try to prevent any future incidents. I will reference just briefly the blue light, which we talked about momentarily. The blue light, we were talking both about Ms. Brown. Ms. Brown was asked if the light was working or not at the time of the incident. I'll refer the court to page 620 of the record. And she said she had no idea whether it was working or not. And there were further questions about, in the past, at no particular time, was there ever a time where that light was not working properly? And she said there may have been a time. And then she was asked if she would have reported it, and she said yes. But there's no indication that here that was the case. And as far as Mr. Collins, he testified that there was no blue light at the time of his incident, and that's undisputed that the light was not installed until after. There is every other employee who testified about that on page 368 of the record, the reference specifically, but actually testified that the light was working at the time of the incident. And with that. What about the record of prior accidents or incidents at that location in the facility? Since you represent the employer, I assume your client would have those records. Yeah. The only previous incident that occurred was the 1999 incident with Mr. Collins. And there's no dispute that Mr. Collins was injured by a falling bag in 1999, more than a decade earlier. But subsequent to that, they installed a gate up on the mezzanine and also installed a blue warning light. And I will mention to the court that it was a different circumstance. In that case, instead of lifting a bag up to the mezzanine, the high-low driver on the top was driving to what's called stage it for it to be brought down. And in doing that, the bag rolled off the edge. Subsequent to that, they installed a safety gate. All right. Thank you. Thank you. Just very briefly, I would note that the House decision, which Brother Counsel mentioned, was a 2007 unpublished decision. And I think it's really factually distinguishable. And when the cases read closely, one of the things that the court talked about was that the injured employee had exercised some independent exercise of discretion in moving out of the safety zone. I know Brother Counsel has indicated that Mr. Barnes was allegedly walking in a non-authorized area, but I think the record clearly shows, one, that there was some question on the day of this incident whether or not the markings that designated a safety zone were even visible for two possible reasons. One, the lines could have been faded. Or two, there could have been press cake piled on top of those lines. And number three, the... Well, I wouldn't agree with that because there's overwhelming testimony by the employees that this was a common pathway that everybody took. And so I think over the course of years, essentially what has happened is Sun Chemical acquiesced to that method of travel and that place of travel by its employees. And it knew it occurred and really didn't, as I mentioned before, took no affirmative steps to make sure that didn't occur. Is there testimony in the record to that point saying that employees commonly used that pathway, people didn't work in that area, and that the company knew about it? Well, as I mentioned briefly before, we knew the company knew about it because I think it was one of the managers who said they had issued a verbal warning. What I'm asking is what's there in the record that would substantiate the statement you just made? Let me take a look. Mr. Collins testified, page 31 of his deposition. He stated to the effect that everyone walked in the area where Mr. Barnes was struck by the press cake. And he defined everyone as being who? Well, I mean, unfortunately I think he used it broadly, but basically the employees at Sun Chemical. You know, Bruce Pontius testified that it was commonly, he said it was commonly known employees walked to find the forklift and walked all over the area when the press cake was being loaded on the mezzanine level. Who were these two individuals and what's the basis for their knowledge? They saw it, along with Ms. Brown. She testified that she had seen employees walk in that area where the incident happened in her deposition, pages 65 and 66. Those are the three that I can find off very quickly. And I think, again, it goes to show their actual knowledge and that an injury was certain to occur. And there was some testimony, although I think we have to look in the light and what's favorable to you, that people were instructed not to walk there, though, right? There was test, I don't know that they were instructed by no one. The manager said he had issued a verbal warning to someone who'd done that. But, again, it goes back to my original argument about a verbal warning that really had no teeth. And I think it goes to the overall lack of concern and care that the company had for the employees. Thank you. All right, thank you very much. And the case is submitted.